25-MJ-4088-DHH<br>25-MJ-4089-DHH

# AFFIDAVIT OF SPECIAL AGENT TIMOTHY TABER IN SUPPORT OF APPLICATIONS FOR A CRIMINAL COMPLAINT AND A SEARCH WARRANT

I, Timothy Taber, having been duly sworn, do hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.  I have been a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI") since May 2018. I received formal training in conducting criminal investigations at the Federal Law Enforcement Training Center in Glynco, Georgia. Prior to becoming a Special Agent with HSI, I served as an Intelligence Analyst with the Federal Bureau of Investigation for approximately ten years. In 2005, I graduated from Northeastern University with a bachelor's degree in criminal justice. In 2006, I graduated from Suffolk University with a master's degree in criminal justice.

2.  I am currently assigned to the HSI New England Document and Benefit Fraud Task Force, a specialized field investigative group comprised of personnel from various state, local, and federal agencies with expertise in detecting, deterring, and disrupting organizations and individuals involved in various types of document, identity, financial, and benefit fraud schemes. As part of this task force, I am responsible for conducting investigations involving, but not limited to, the manufacturing, counterfeiting, alteration, sale, and use of identity documents and other fraudulent documents to evade law enforcement or for other criminal activity. Due to my training and experience, as well as conversations with other law enforcement officers, I am familiar with the methods, routines, and practices of document counterfeiters, vendors, and persons who fraudulently obtain or assume false identities.

3.  I have participated in various aspects of investigations into the use and manufacture of fraudulent documents, including conducting physical surveillance, surveillance of controlled purchases involving undercover agents and/or cooperating persons, the introduction

of undercover agents, the execution of search warrants, the effecting of arrests, and the debriefing of defendants, informants, and witnesses.

4. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws.

## PURPOSE OF AFFIDAVIT

5. I submit this affidavit in support of an application for a criminal complaint charging Liene TAVARES DE BARROS JUNIOR ("TAVARES") with Unlawful Transfer of a Document or Authentication Feature, in violation of 18 U.S.C. § 1028(a)(2).

6. I also submit this affidavit in support of an application for a search warrant for the following property: ▇▇▇▇▇▇▇, Woburn, Massachusetts 01801 ("Target Residence"), as described in Attachment A. I have probable cause to believe that this property contains evidence, fruits, and instrumentalities of the crimes identified above, as described in Attachment B.

7. This affidavit is based on my personal knowledge, information provided to me by other law enforcement officers and federal agents, and my review of records described herein. This affidavit is not intended to set forth all of the information that I have learned during this investigation but includes only the information necessary to establish probable cause for the requested criminal complaint and search warrant.

## PROBABLE CAUSE TO BELIEVE THAT A CRIME HAS BEEN COMMITTED

8. By way of brief summary and as set forth in more detail below, on two dates TAVARES has sold in total three fake Social Security Number cards and three Lawful Permanent Resident cards (also known as "green cards") to an undercover officer. Social Security Number cards and green cards are "identification documents" purportedly issued by the

United States under 18 U.S.C. § 1028(d)(3). For one of those dates, the meeting was in close proximity to the Target Residence, and agents saw TAVARES arrive from and return to the area of the Target Residence for the sale.

### *SALE OF IDENTIFICATION CARDS*

9. In March 2024, I received information that TAVARES was selling counterfeit identity documents which included green cards and Social Security Number cards from Cooperating Person 1.[1]

10. Cooperating Person 1 provided contact information for TAVARES. Using WhatsApp, a communication application, I contacted TAVARES. TAVARES' WhatsApp account was associated with a telephone number of ▇▇▇-3898. I have reviewed records from WhatsApp and these records show the name associated with the account linked to phone number ▇▇▇-3898 was JR Capixaba. However, I have also reviewed records from T-Mobile which show that the ▇▇▇-3898 number is assigned to an account in the name of Junior Barros of ▇▇▇ in Woburn, MA. This is the same address that appears on TAVARES' Massachusetts driver's license.

11. On or about September 13, 2024, I contacted TAVARES via WhatsApp text message requesting, in Portuguese, to purchase counterfeit identity documents. I used an online tool to assist with the English-Portuguese translation. In response, in the form of a voice memo in Portuguese (which I translated with the assistance of Cooperating Person 2),[2] TAVARES

---

[1] Cooperating Person 1 knows TAVARES and reported to law enforcement his/her concern about TAVARES and others improperly working in the United States. Cooperating Person 1 has not received any compensation or other benefit from the U.S. Government for providing this information.

[2] Cooperating Person 2 is a former confidential informant with HSI who historically provided HSI with reliable information for a number of years. This individual received immigration benefits from the government as a result of their cooperation but those benefits have since expired.

stated that he could help me and would speak to me when he was available.

12. On or about September 17, 2024, I used Cooperating Person 2 to assist me in communicating with TAVARES over a WhatsApp audio call. This individual spoke with TAVARES in Portuguese to discuss the purchase of counterfeit identity documents. This voice call and others leading up to the first sale were not recorded. I do not speak Portuguese. Cooperating Person 2 talked with TAVARES in Portuguese and, according to Cooperating Person 2, TAVARES stated he could sell a social security card and LPR card for $250. Cooperating Person 2 stated that he/she would call TAVARES back when they wanted to proceed further.

### October 28, 2024 Sale

13. On October 10, 2024, I, with Cooperating Person 2 to communicate in Portuguese, called TAVARES over WhatsApp using the same -3898 number to follow up on the purchase of counterfeit identity documents. TAVARES seemed not to have remembered the conversation on September 17, 2024 and asked Cooperating Person 2 how he/she got TAVARES' contact information. Cooperating Witness 2 explained to TAVARES that he/she was at a party and received TAVARES' information from another person. TAVARES stated he needed a reference before proceeding further.

14. On or about October 16, 2024, Cooperating Person 3[3] called TAVARES and vouched for the person I was pretending to be (with Cooperating Person 2 assisting me as the person who spoke in Portuguese). Cooperating Person 3 had previously purchased counterfeit documents from TAVARES a few months previously as part of this investigation. As a result of

---

[3] Cooperating Person 3 is a former confidential informant for HSI (deactivated in December 2024 due to time limitations), and I know that this person has provided reliable information to law enforcement in the past. This individual has received immigration benefits from the government as a result of their cooperation.

that conversation, TAVARES agreed to continue to speak with me (and the Cooperating Person 2). On or about October 16, 2024, Cooperating Person 2 and I called TAVARES via WhatsApp to arrange the purchase of a counterfeit Social Security Number card and a counterfeit green card. According to Cooperating Person 2, TAVARES stated he needed a picture (for the green card), a name, date of birth, picture of a signature, and nine digits for the Social Security Number card. Through a series of text messages sent via WhatsApp in Portuguese between October 16 and 17, 2024, I sent this information to TAVARES. All of the information was fabricated by investigators; the submitted photograph was of an agent working on this investigation.

15. Through WhatsApp, TAVARES and I coordinated to meet on October 28, 2024 at ▬▬▬▬, Woburn, MA to complete the sale. On October 28, 2024, TAVARES communicated via WhatsApp text message to change the location of the meeting to ▬▬▬ ▬▬▬▬▬ Boston, MA. At approximately 1:34 p.m., an undercover agent, equipped with audio and video recording devices, met with TAVARES on Parkman Street in Boston and handed TAVARES $250 cash in exchange for one green card and one Social Security Number card bearing the same biographical information previously supplied to TAVARES by me through WhatsApp. At approximately 1:37 p.m., TAVARES departed the area in a black Ford F-150 bearing MA registration ▬▬▬ with an unknown female passenger.

### December 5, 2024 Sale

16. In November 2024, the same undercover agent (who had now assumed the role of me/Cooperating Person 2) contacted TAVARES via WhatsApp at the same -3898 number pretending to be me and requested to purchase additional identification documents over text messages and audio messages in Portuguese. This undercover agent speaks Portuguese. These messages have been recorded and preserved and I have reviewed an English translation of these

materials. The agent ordered two sets of counterfeit identity documents from TAVARES for $500 total. Each set consisted of one green card and one Social Security Number card. As with the last time, the undercover agent provided TAVARES with the names, dates of birth, pictures, signatures, and Social Security numbers (known to be unassigned). TAVARES agreed to meet the undercover agent on December 5, 2024, at 3:30 p.m. at ▊▊▊▊▊▊, Woburn, MA.

17. On December 5, 2024, at approximately 3:53 pm, the undercover agent, equipped with audio and video recording devices, went to ▊▊▊▊▊▊ to meet with TAVARES. While surveilling the area, agents observed TAVARES traveling on foot behind ▊ ▊▊▊▊▊▊ which is located directly behind the Target Residence. The undercover agent eventually located TAVARES and handed him $500 cash in exchange for two counterfeit social security cards and two counterfeit LPR cards bearing the same biographical information previously supplied to TAVARES by the undercover agent.

18. During the meeting, the undercover agent asked TAVARES in Portuguese how long it would take for TAVARES to make identity documents for four people. TAVARES responded that he could have the documents ready as quickly as the same day they are ordered, but it depended on what he was doing on a particular day. TAVARES also stated that he did not like to do it on the weekends because he would be spending time with his girlfriend and sometimes after going out, he will return home and not feel like doing it.

19. At approximately 4:30 p.m., law enforcement officers observed TAVARES accessing a black truck, similar to that seen being driven by TAVARES at the October transaction, that was parked in the driveway of the Target Residence.

20. Based on the conversation following the controlled sale, I believe TAVARES is producing counterfeit identity documents inside the Target Residence. Further, based on the fact

that TAVARES was observed walking from the area of the Target Residence prior to the controlled purchase and was seen in the driveway of the Target Residence soon after the controlled purchase, I believe that TAVARES left from, and returned to, the Target Residence shortly before and after the controlled purchase. Accordingly, there is probable cause to believe that the items described in Attachment B will likely be found in the Target Residence.

21. All three green and Social Security Number cards sold by TAVARES are counterfeit. The Social Security Administration determined the numbers, provided by the agents and listed on the Social Security Number cards are not valid because they have never been issued. The green cards are also fraudulent because they contain the photos of federal agents who never applied for lawful permanent resident status and the photos were provided by an undercover agent to TAVARES.

## PROBABLE CAUSE TO BELIEVE THAT EVIDENCE, FRUITS, AND INSTRUMENTALITIES WILL BE LOCATED IN THE TARGET RESIDENCE

22. I believe TAVARES resides at the Target Residence based on the physical surveillance conducted for the document buy on December 5, 2024. That buy occurred in a street that can be accessed from the rear of the Target Residence. In addition, after the buy, TAVARES was seen accessing a truck parked in the driveway of the Target Residence.

23. On December 12, 2024, at 6:00 a.m., agents initiated surveillance of the Target Residence and observed the following vehicles parked in the driveway: a 2014 black Nissan Versa bearing MA registration plates 5LCB18 and a black Ford F150 bearing MA registration plates ███████, matching that driven by TAVARES at the October transaction. At 11:16 a.m., agents observed TAVARES and an unknown female exit the Target Residence and depart in the black Ford F150. I would also note that for the October 28, 2024 sale, TAVARES initially directed the undercover agent to that same ███████ address.

7

24. Furthermore, I have reviewed a Massachusetts Driver's License issued to TAVARES. TAVARES listed the Target Address as his mailing address with the Massachusetts Registry of Motor Vehicles. Additionally, T-Mobile records for the -3898 number list the Target Address as the home address.

25. In addition, as discussed in paragraph 18 above, based on TAVARES' statements, I believe that he is manufacturing these fraudulent identification documents in his home. I know based on my training and experience, which includes the execution of search warrants and in speaking with other law enforcement officer that:

    a. It is common for those who possess fraudulent identity documents to keep them in secure locations to conceal them from law enforcement authorities.

    b. Individuals often keep identification documents and financial records in their residence, in part to ensure the security of these documents and to allow for easy access and use when necessary.

    c. It is common for individuals who possess and or manufacture fraudulently obtained identification documents to retain those documents for substantial periods of time.

    d. Individuals often keep identification documents and financial records for long periods – sometimes years – and tend to retain such documents even when they depart a given residence. Such documents include driver's licenses, social security cards, bank cards, credit cards, bank records, and bank statements.

    e. Individuals who sell fraudulent identification documents, and in particular multiple sets of such documents, often possess evidence relating to the possession, production, and/or sale of fraudulent identification documents, including

but not limited to communications with customers or co-conspirators, document templates, printers, laminators, cutting boards, and fraudulent documents that have been produced but not yet sold to the end user. In addition, I know that individuals who are making fraudulent identification documents often do so with the use of a computer. Therefore, their computer devices, including phones, will often have evidence of how the identification documents were made, communications with customers/co-conspirators, payment and financial information, and other information.

26. From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through email, instant messages, and updates to online social networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online. In this case, I know that TAVARES arranged the illegal transactions outlined herein through electronic communications.

27. Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

28. From my training and experience, I am aware that personal computer systems

are generally capable of creating, receiving, and otherwise processing computer files such as email, word-processing documents, photographs, and spreadsheets.

29. From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in computer hardware, computer software, smartphones, and storage media.

30. Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

    a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

    b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user generated files, computers' internal hard drives contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to

delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

      d.    Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

      e.    Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

      f.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from

further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital

camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

  g. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

  h. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  i. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular

thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

31. Based on my knowledge and training and the experience of other agents with I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media be seized and subsequently processed by a computer specialist in a whom laboratory setting rather than in the location where it is seized. This is true because of:

 a. The volume of evidence storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on site.

 b. Analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized

skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap." Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

32. The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant. If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

33. This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law

enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the HSI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CONCLUSION

34. Based on the foregoing, I have probable cause to believe that on or about October 28, 2024 and December 5, 2024, TAVARES knowingly and without lawful authority transferred an identification document, authentication feature, or false identification document knowing that such document or feature was stolen or produced without lawful authority, in violation of 18 U.S.C. § 1028(a)(2).

35. Finally, there is probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are located in the premises described in Attachment A.

Sworn to under the pains and penalties of perjury,

*Timothy Taber*
Special Agent Timothy Taber
Homeland Security Investigations

SWORN before me telephonically pursuant to Fed. R. Crim. P. 4.1 this __7__ day of March 2025.

11:35 a.m.

_____
HONORABLE DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE

16